Good morning, Your Honors. Stephen Schmid appearing for appellants and plaintiffs in this action. Obviously, there's numerous concerns that I as a counsel have with reference to the trial court's decision, but what I found most disturbing is the very blatant, on-the-record disregard of the rule on summary judgment that all inferences are to be made in favor of the non-moving party. There, as an example that I cited in a brief, the trial judge rejected my client's declaration with reference to numerous items, but as a classic example was the declaration with reference to non-ambulatory people and their location in the building. My client put in a declaration form with foundation his belief, not his belief, his statement and his understanding and his knowledge of the fact as an owner and operator of the building as to the location of these alleged non-ambulatory people. He testified under oath that there's only two non-ambulatory people, and the Court outright rejected that. Why wouldn't two be enough?  Why wouldn't two be enough? Well, two would be indicative of the factors that were being trumped up by the defendants in this matter. The two goes to the 11th. In other words, what we have is clearly someone trying to make an emergency where there is no emergency. Right. But, I mean, my question to you is, let's assume that your client's entirely correct, that there were two non-ambulatory people who were on an upper floor who couldn't get down because of the elevator. That doesn't make any sense. Excuse me. Let's take it one at a time. Why wouldn't that be enough? Because that does not evidence any emergency. I mean, there's all sorts of houses. My grandfather lived with non-ambulatory on the third story of a building for, you know, last year of his life. How do you deal with the evidence that indicated that there was a person on an upper floor who couldn't get to the doctor, missed several doctor's appointments because there was a non-working elevator? That's all hearsay, number one. And number two, there is. Yeah. I mean, what can I say? If you're going to reject that on hearsay, your client's knowledge has to fall in that same category. So presuming it's true, what do you do with that? Well, I mean, again, there's no evidence that that person was in any emergency or that that person was in any way that no doctor was able to attend that person or that person was not able to get the medicine. I mean, there's just no evidence of that. We don't even know who the name of the person is. Well, it's in 217, right? Room 217, if I'm recalling it correctly.  I don't know. But that would certainly be on the second floor, which might be, would correspond with what my client declared. And my client's declaration was the non-ambulatory individuals were tended to by able-bodied people. I believe in one circumstance was a husband and the other, there was some other second person living in the unit with him. So, I mean, again, that just goes to the fact that these are issues for a jury to decide. And in my ‑‑ there's no evidence that that would make the building an emergency. I mean, even if you had one or two or even 11 people that were totally non-ambulatory and they could not see a doctor, you don't shut down the whole building for that reason. There's no ‑‑ there's no ‑‑ there's no link between anything that they are saying it was an emergency. In other words, if you have these individuals that are in dire straits, and I'm not conceding they are, but if they were, then wouldn't the proper remedy be to evacuate those individuals? And that would eliminate the emergency, if there were an emergency. But there's nothing there to indicate that these individuals would have been able to even use an elevator if it were there, if it were functional. I mean, so how does that tie in? How does that make ‑‑ how does that inoperative elevator make and create an emergency? As evidenced by the declaration submitted by our expert, there is no requirement for an elevator in these buildings, number one. Number two, that there is adequate access to attend these people through other means, including the exceptionally wide stairways and the exceptionally ‑‑ exceptional accommodations because of the former hotel status of this building. And we're not talking about, you know, normal stairways, back hall stairways or something. We're talking big, wide stairways. So, again, the fact that even if these non‑ambulatory people did exist, there's no ‑‑ Well, at least two existed. Why do you say even if they did exist? You know that two existed because that's what your client said. Right. I mean, there's no doubt that there were non‑ambulatory people. There's two non‑ambulatory ‑‑ I mean, the only dispute ‑‑ Agreed, Your Honor. The only dispute is whether two or 11. Agreed. Well, that's true, Your Honor, but the two that were referenced by my client were on the second floor, which makes them much more accessible, number one, which goes to undermine the contention that there's somehow an emergency here. And it also, two versus 11, goes to undermine the concocted, in our opinion, concocted after the fact justification for the evacuation, that they didn't have enough manpower to evacuate 11 people. Okay. When they could do 100 people. I don't understand your equal protection argument. Could you describe it for me? What class are we talking about? The protected class that we're talking about, the discriminated class here, is lower income and actually mentally ill people. And I think it's comparable to the armored DARA's case, which basically had the same class that was found to be denied equal protection of the law. I will concede, Your Honor, that our equal protection argument is very slim, but I still believe that there is sufficient evidence there for a trier fact to reasonably conclude that there was denial of equal protection of the law, that there was a target here. The target was lower income and mentally ill people. And that was confirmed by an expression by the police chief at an open meeting. And that was put in the record by my client's declaration. The totality of the circumstances show that there's an ongoing effort to rid the city of these, quote, people, as the chief described them, by shutting down the building, which they, in fact, ultimately did. So that would go to the equal protection argument. And the other class is what? The non, I mean, every other commercial building in this city? Well, the way I read and understand the armored DARA's number two, Your Honor, is that if the action is arbitrary and capricious, then that's enough to raise the level of denial of equal protection. So I don't think that we have to show another class per se, other than that this was a targeted class and it was arbitrarily and capriciously targeted. I mean, that's my response to that, Your Honor. And if I'm wrong, I'm wrong in the law. But that's, that would be my position. But I think the fundamental issue here is what constitutes an emergency? And the fact that you have, at any given time, a person could develop a situation where they become non-ambulatory, and that doesn't allow a city to come in and shut it down, shut down a building. It doesn't allow it to come in, especially without notice. Let's take the hypothetical that there were, in fact, nine, 11, sorry, Your Honor, you were going to say something? No. My question is on the state of evidence on notice. As I understand the record, there's no dispute that White was given notice, correct? Notice of? Of the potential closure. Well, we. He says he got notice. They say they gave him, they gave him notice. They, the language that was used, that there might be a need to evacuate are loose words, matter of fact. And if you credit both the testimony of Mr. Goyer and Mr. White, that's basically the sum of what they say. Right. But there's no competing evidence on that point, is there? Well, there is, because Mr. Your client said he didn't get notice. I'm asking you about whether White, the manager, got. Is there any dispute that there was a communication between the city and White, the manager? Yes. Yes, there is. And I think the reasonable inference from the declaration of Mr. Benefield is, is that had that been communicated to Mr. White, number one, it would have been communicated by Mr. White onto him, which he denies happened. And number two, that historically Mr. Goyer had directly communicated with Mr. Benefield regarding these matters. So a reasonable jury could infer from those facts that this alleged communication between Mr. White and Mr. Goyer never occurred. So if I understand the state of the evidence, White says there is a communication. The city says there is a communication to White, correct? That, well, that's correct. Your client basically says historically there was direct communication and White never talked to me and he would have talked. That's what we have on the record. And we also have the post-incident interview of Mr. White in the record, which the court disregarded. And I believe that is admissible, at least at summary judgment stage, to show that Mr. White did a 180-degree turnaround on Mr. Benefield. And there's no question there's evidence in the record on the fact that Mr. Benefield did a 180-degree turnaround on Mr.      Benefield did a 180-degree turnaround on Mr. Benefield afterwards for money and there's bad blood there. So that explains why, in fact, Mr. White said what he did say. Now, when I interviewed Mr. Kennedy. I mean, where I was headed with this is let's presume for the sake of argument that there was notice to White. All right? Okay. And I'm accepting your argument that you dispute that and I understand it. But let's assume for the sake of argument there was notice to White. Why wouldn't that be sufficient to comply with the requirements of procedural due process if you notify the manager of the building that you intend to evacuate? Well, number one, they did not say they intended to evacuate. They only by the best testimony given, they only hinted that evacuation may be necessary. It's just entirely different. I don't want to parse the facts. I'm just asking you in a generic way. And I realize you want to argue the facts with me, but I'm not interested in that for this question.  I'm not interested in that for this question. If let's assume for the sake of argument that there was adequate notice given to White. Okay? I'm just assuming. I know you dispute that. Is that enough to comply with the requirements of procedural due process? Okay. So in other words, is notice to an agent sufficient? Generally speaking, yes. I don't think he was a proper agent for this under the context. But I understand the court's logic. No, no. I'm just asking you a question. And I'm not disputing. Yeah. I mean, obviously, if adequate notice is given to an agent, then it's binding on the principle. That I do not dispute. So your position, he's not a proper agent, and you dispute the notice. That and also, but more fundamentally, Your Honor, is the adequacy of the notice.  Notice? I mean, that's not due process notice. We're talking about something major here, Your Honor. We're not talking about, you know, some $50 issue or $10 issue. We're talking about basically seizing and shutting down a building, a big building. And I do not believe that that rises to the notice that's required under the due process clause. I mean, when I get a summons, that's a notice. When I get a written letter, that's notice. I mean, in this day and age, there's no reason why you can't generate a written notice. It identifies what's going to happen and why it's going to happen. That would be adequate notice, in my opinion, based on case law and due process. If I could switch gears. I mean, we also have the equally and maybe easier argument with reference to the Fourth Amendment. Under the Soldall case, there's no question that you have to get a warrant unless there's exigent circumstances. Once again, what are the exigent circumstances here? There are none. I mean, at best, they could go to a court and say we have one or two people on the or 11 people that cannot get a doctor. I mean, does anyone really believe that a judge would issue an order that the whole building would have to be evacuated as a result of that? That makes no sense. That does not even fly. I mean, that if you have a little problem, you don't, as I said in my brief, you don't go out to bay with a bathwater. I mean, my clients have no ability to determine when someone's going to become non-ambitory or not. As I just stated, it can happen from moment to moment, unfortunately. Is there any dispute that this building was occupied by elderly or disabled people? Well, certainly there were elderly, but I would not say that there are most people are not that elderly, Your Honor. I can't give you an honest breakdown, but I can vouch that they were not. Most of them were, I would say, under 55. Is that do we have anything in the record on that? I can't. No, I don't believe there's a breakdown on that. You used more than you used your time. Yeah. Are there any further questions? No. Thank you. Good morning, if it pleases the Court. I'm Doug Thorne. I represent the city of Oroville and its employees who were sued in this case, and I'm here to ask the Court to affirm the trial court's grant of summary judgment. This case began, as it ended, with vague allegations of constitutional   violations. The declaration of Mr. Benefield encompasses what we found in discovery, which are broad allegations that have no foundation, that are largely opinion, that cannot be substantiated with documentation, that contain matters not presented to the city, not presented in discovery, and when the trial court reviewed the evidence that the city presented in support of the summary judgment, it correctly concluded that there was no genuine or material dispute in the evidence. And what we have is a fire on the 12th of June that caused the city code enforcement to come out to the building to start this process, and almost daily thereafter, code enforcement resources and folks meeting with the owner to deal with such matters and not having any results until eventually they discovered that the elevator was not going to be repaired. They did not have the resources to help folks out in the event that an emergency situation like a fire did occur. I think one of the disputes that I'd like to address is what is an emergency? I agree. What is an emergency? The case law doesn't require, in the event of a bomb threat, for the bomb to go off for there to be an emergency to evacuate the building, thankfully. I mean, we had a series of circumstances and conditions at a particular point in time that required its evacuation. The city paid for the evacuation. Why was evacuation required of the ambulatory residents? Because of the condition of the building, they're subject to the fire as well. Well, I think the concern was the fire. That's what brought the city out there in the first place. If you look at the declaration of Goyer that we submitted. But you can't use an elevator in the event of a fire anyway. You can. That's a misnomer. The fire department takes control of the elevator to use it. You're not supposed to use it on your own. They have a key, and that's what the key is, so that they control who goes up and down. Right, but there's some danger associated with that. Yeah, there's some danger. I mean, that's all drilled into us. Go to the stairs. Don't take the elevator. I recognize that the fire department has some overhide. But there's other issues as well. I mean, you'll see electrical connections that are just bare in walls. Right, well, I looked at all the evidence in the case, and I understand there are a lot of problems there. I guess here are my two problems with your case. First, I don't understand how the notice of evacuation was given in a way that allowed a contest of the evacuation. I'm sorry, I didn't hear the last part. The form of the notice. As I look at the record, it looks as though the city official said, we may have to evacuate to Mr. White, right? Yeah. And then that was followed by the order of evacuation. Well, there's more in between the two. I mean, there's more in between those two. On the 12th, when Goyer and the other code enforcement officer met with Mr. White on site, Mr. White then advised them there were other problems, serious maintenance issues. That's when they went around and they said that the cumulative effect is that we may have to evacuate the building. Thereafter, they continued their discussions. They had almost daily meetings, I think, if you look at the declaration of White. And they were being told, you have to get these fixed or we're going to have to evacuate. The elevator was really the big... Well, that was the tipping point when they found out there were no repairs were scheduled. I understand that. And just legally, usually when you have a procedural due process case, you have, here's the notice, here's your opportunity to object, here's the action that takes possession of the property. And I understand there are other arguments to be made, but I'm focusing on the notice. It doesn't look to me as though, in this case, there was any time when you said, you need to make repairs by X or we will evacuate. There were suggestions that we might have to. Daily discussions, I agree with you. Is there a point where they were notified, you have to make repairs by X date or we're going to evacuate? Is there any such... Not pre-evacuation in writing. There was the notice that was posted on the date of evacuation giving them the right to appeal, vote appeal or contact the code enforcement folks immediately. There was no pre-evacuation written. Explain to me how that would have worked. I mean, let's assume you wanted to appeal the order of evacuation. What was our mechanism to stay the evacuation at that point? Yeah, I mean, I think from due process, not only did they have due process with the daily meetings, constitutes due process, but it says right in the notice that they posted that you can contact the code enforcement. I mean, it's a fluid situation. No, I understand, but under the way, I'm just asking for the city procedure. Let's assume you post an evacuation notice. You say, call this number if you want to protest. Yes. What happens then? How does someone get a hearing and stop the evacuation? They call the phone number. And then what happens? The city attorney, in this case, the city attorney and the code enforcement and the police chief got together and found out what is the situation. Why are we at this point and are we going to continue forward or do you have grounds to continue with the evacuation to force them to make these repairs before allowing people to reenter the building? I mean, that is what happened. So the city's position is that the written order or the order of evacuation carries with it some time interval to an ability to have a hearing or some process before the evacuation. That seems a little counterintuitive to me. No, I would not characterize it as a pre-evacuation ability to call and say, hey, let's put the brakes on this. They didn't give it until, I mean, the reality of it is they didn't give that written notice until after the evacuation began. I mean, that was the last step in the evacuation is to post that on the building. So we concede that they did not get a written notice before the evacuation that said you had to comply by a particular date and time. We feel the circumstances are under the fluidity of the procedural due process. They were aware of the conditions in the building that the city was worried about, I take it. They being the owners? Yes. Yes, absolutely. I mean, we were meeting with them on a daily basis to get them repaired. We were being told that these repairs had been scheduled. In some cases, some repairs were done and checked off on, and then the drywall removed and used elsewhere. So this was a daily dose of due process where I have not heard anybody say that we didn't know what the city wanted us to do in order to avoid an evacuation. It came down to, in our view, sort of a shell game about what repairs were going to be done and when. In the end, the police chief's testimony was he started losing sleep over it. The fire went off was the big concern. He was troubled by making a repair and then moving it to another location as well. So the variety of factors, the age, the disability of the tenants, I don't think it's disputed in the record that they were mostly elderly, disabled, economically disadvantaged folks. That's a point of low-income housing, right? Yeah. And the idea that we want to discriminate against them and get rid of them by moving them to safe quarters, feeding them, making sure their needs are met for seven or eight days while we force their landlord to make their tenement safe, no reasonable jury could make that conclusion, I don't think. And this is not an Armendariz case. I mean, I think it's the model for what Armendariz is not. We don't have the conspiracy with a city attorney and a developer to acquire this property and a bunch of others for non-public uses and to use the code enforcement tool as a method to do that. I think no reasonable jury could conclude anything other than we were trying to help these folks out and for seven or eight days we did that. Would it have been easier here on this appeal if we would have posted a pre-evacuation notice? Yes, it would, but we didn't. But we feel that... Better practice, too, actually. The fluidity of it was such that we felt they were on notice, that we'd been communicating with them, that they knew exactly what was required to avoid it and didn't do that. Is there any further questions? I have no questions, thanks. Thank you. Thank you. Can I just briefly respond to a couple of questions? We'll give you one. You've more than used your time, but we'll give you one minute if you want. I have 15 minutes, Your Honor. No, you were in the red. That was his view. Oh, I'm sorry. Just briefly, I mean, because Judge Thomas touched on the issue of the elevator being, quote, unquote, the tipping point or the lack of scheduled repair of the elevator. And that's a hotly disputed fact in this thing. And there's no question about it that the elevator was scheduled for repair. The repair people, unfortunately, showed up the next day. But the notion that the elevators were not scheduled for repair is completely refuted by the declaration of the elevator repair company. I mean, it just – it makes – I mean, these are things for the jury. And these alleged violations, they are listed there. There's nothing on their list of violations that even comes close to be threatened. This fire was nothing but some arcing on the wire outside the building on concrete. There's no fire. This is all trumped up, and it's for a jury to decide these things. Thank you very much, Your Honor. The case just argued is submitted for decision.
judges: Schroeder, Thomas, Gould